Slip Op. 21-152

### UNITED STATES COURT OF INTERNATIONAL TRADE

|   |   |
|---|---|
| ROYAL BRUSH MANUFACTURING, INC., | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | Before: Mark A. Barnett, Chief Judge |
| Defendant, | Court No. 19-00198 |
| and | |
| DIXON TICONDEROGA CO., | |
| Defendant-Intervenor. | |

### <u>OPINION</u>

[Sustaining U.S. Customs and Border Protection's finding of evasion under the Enforce and Protect Act, as amended by its Final Remand Redetermination.]

Dated: October 29, 2021

<u>Ronald A. Oleynik</u>, Holland & Knight LLP, of Washington, D.C., argued for Plaintiff. With him on the brief were <u>Antonia I. Tzinova</u>, <u>Dariya V. Golubkova</u>, and <u>Libby K. Bloxom</u>.

<u>Ashley Akers</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant. With her on the brief were <u>Brian M. Boynton</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Patricia M. McCarthy</u>, Assistant Director. Of counsel on the brief was <u>Joseph F. Clark</u>, Attorney, Office of the Chief Counsel, U.S. Customs and Border Protection.

<u>Felicia Nowels</u>, Akerman LLP, of Tallahassee, FL, argued for Defendant-Intervenor.

Barnett, Chief Judge:  This matter is before the court on U.S. Customs and

Border Protection's ("Customs" or "CBP") first remand redetermination in connection

with EAPA Case No. 7238.  *See* Final Remand Redetermination ("Remand Results"),

ECF No. 55.[1]  CBP issued the Remand Results pursuant to *Royal Brush Manufacturing,*

*Inc. v. United States* ("*Royal Brush I*"), 44 CIT __, 483 F. Supp. 3d 1294 (2020), which

addressed certain challenges to CBP's affirmative determination of evasion of the

antidumping duty order on certain cased pencils from the People's Republic of China

("China") brought by Plaintiff Royal Brush Manufacturing, Inc. ("Royal Brush").  CBP

issued its evasion determination pursuant to its authority under the Enforce and Protect

Act ("EAPA"), 19 U.S.C. § 1517 (2018).[2]

---

[1] The administrative record for the underlying proceeding is contained in a Confidential Administrative Record ("CR"), ECF Nos. 24-1 (CR 1–12), 24-2 (CR 13–14), 24-3 (CR 15–19), 24-4 (CR 20–27), 24-5 (CR 28–34), 24-6 (CR 35–37), 24-7 (CR 38–41), 24-8 (CR 42–44), 24-9 (CR 45–47), 24-10 (CR 48–50), 24-11 (CR 51), 24-12 (CR 52–54), 24-13 (CR 55–57), 24-14 (CR 58–69), 24-15 (CR 70–86), 24-16 (CR 87–122), 24-17 (CR 123–24), 24-18 (CR 125–26), 24-19 (CR 127–32), and a Public Administrative Record ("PR"), ECF Nos. 23-1 (PR 1–35), 23-2 (PR 36–43), 23-3 (PR 44–64).  The administrative record for the Remand Results is likewise contained in a Confidential Remand Record ("CRR"), ECF No. 60-1 (CRR 1–4), and a Public Remand Record ("PRR"), ECF Nos. 59-1 (PRR 1–18), 59-2 (PRR 19–32), 59-3 (PRR 33–39), 59-4 (PRR 40–47), 59-5 (PRR 48–54), and 59-6 (PRR 55–80).  The court references the confidential version of the record document, unless otherwise specified.

[2] "Evasion" is defined as "entering covered merchandise into the customs territory of the United States by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material, and that results in any cash deposit or other security or any amount of applicable antidumping or countervailing duties being reduced or not being applied with respect to the merchandise."  19 U.S.C. § 1517(a)(5)(A).  Congress enacted EAPA as part of the Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114–125, § 421, 130 Stat. 122, 161 (2016).  On August 22, 2016, CBP promulgated final interim regulations to guide Customs' implementation of the EAPA framework.  *See*

Royal Brush opposes the Remand Results.  Confidential Pl. [Royal Brush's] Opp'n Cmts. to Agency Final Remand Redetermination Pursuant to Court Remand ("Pl.'s Opp'n Cmts."), ECF No. 64.  Defendant United States ("the Government") responded in support of the Remand Results.  Def.'s Resp. to Cmts. on Remand Redetermination ("Def.'s Reply Cmts."), ECF No. 68.

For the following reasons, the court sustains CBP's final evasion determination, as amended by the Remand Results.

BACKGROUND

I.    **Factual and Procedural Background**

The court summarized the legal framework for EAPA investigations and the factual and procedural history of this case in *Royal Brush I*, 483 F. Supp. 3d at 1297–1301.  While familiarity with *Royal Brush I* is presumed, the court recounts the background relevant to resolving the remaining issues in this case.

Royal Brush is a domestic importer of pencils exported to the United States from a company located in the Republic of the Philippines ("the Philippines").[3]  *Id.* at 1298.  On February 27, 2018, Defendant-Intervenor Dixon Ticonderoga Co. ("Dixon")[4] "lodged an allegation with CBP in which it averred that Royal Brush was transshipping pencils made in China—and subject to an antidumping duty order on certain cased pencils from

---

*Investigation of Claims of Evasion of Antidumping and Countervailing Duties*, 81 Fed. Reg. 56,477 (CBP Aug. 22, 2016) (interim regulations; solicitation of comments); 19 C.F.R. pt. 165 (2017).

[3] To avoid disclosing confidential information, the court will refer to the alleged manufacturer as "the Philippine Shipper."

[4] Dixon did not submit comments on the Remand Results.

China—through the Philippines." *Id.* (citations omitted); *see also Certain Cased Pencils from the People's Republic of China*, 59 Fed. Reg. 66,909 (Dep't Commerce Dec. 28, 1994) (antidumping duty order) ("*Pencils Order*"); *Certain Cased Pencils From the People's Republic of China*, 82 Fed. Reg. 41,608 (Dep't Commerce Sept. 1, 2017) (continuation of antidumping duty order).[5]

Customs initiated an investigation into the transshipment allegation on March 27, 2018, and, following a site visit by a CBP Attaché to the Philippine Shipper's facility, imposed interim measures[6] suspending liquidation of entries made on or after March 27, 2018, and extending the liquidation of pre-initiation entries. *Royal Brush I*, 483 F. Supp. 3d at 1298–99.[7]

---

[5] The *Pencils Order* covers "certain cased pencils . . . that feature cores of graphite or other materials encased in wood and/or man-made materials, whether or not decorated and whether or not tipped (e.g., with erasers, etc.) in any fashion, and either sharpened or unsharpened." 59 Fed. Reg. at 66,909.

[6] CBP may impose interim measures within 90 days of initiation of an investigation when the agency determines "there is a reasonable suspicion that such covered merchandise was entered into the customs territory of the United States through evasion." 19 U.S.C. § 1517(e).

[7] CBP's Attaché prepared a report documenting certain findings. *See* EAPA 7238–Site Visit Report: [Philippine Shipper], Subic Bay, Philippines (June 15, 2018) ("Attaché Report") at CBP0002540, CR 5, PR 8. The Attaché concluded that the Philippine Shipper has "the capacity to finish some product, but the on-site evidence clearly reveals the repackaging of completely finished products from China." *Id.* The Attaché observed "staff . . . making minor alterations or simply sharpening pencils" and "repacking China origin products into boxes labeled, 'Made in Philippines.'" *Id.* at CBP0002541. The Attaché noted that manufacturing equipment was covered in dust or cobwebs; the "manufacturing warehouse did not indicate production of any products for some time"; they did not observe any raw materials; and the storage area contained "boxes with Chinese characters and English language boxes stating, 'Made in the Philippines.'" *Id.*

Then, "[f]rom November 14, 2018, through November 17, 2018, Customs

conducted a scheduled verification at the Philippine Shipper's facility." *Id.* at 1299–1300

(citing On-Site Verification Report (Feb. 11, 2019) ("Verification Report") at 2, CR 129).[8]

Prior to conducting the verification, CBP informed the Philippine Shipper that the

verification could cover any "information in the United States or foreign countries

collected under [19 C.F.R.] § 165.23 as is necessary to make [CBP's] determination."[9]

Site Verification Engagement Letter (Nov. 7, 2018) ("Verification Agenda") at 1, CR 121,

PR 33–34.  CBP also explained that the Philippine Shipper should "be prepared to

walkthrough [its] production process in detail using [five identified invoices]."  *Id.* at 2.

The Verification Report summarized CBP's attempts to verify production

information associated with the five invoices plus two additional invoices and included

as attachments 32 photographs taken inside the Philippine Shipper's facility.  *See

generally* Verification Report.  In the report, Customs explained that the Philippine

Shipper was unable to provide inventory receipt records for pencils purchased from

Chinese suppliers and, at times, handwrote "pencils" with inventory receipts ostensibly

related to the purchase of raw materials.  *Id.* at 5.  CBP was unable to fully verify the

production of pencils sold pursuant to the identified invoices as a result of the Philippine

Shipper's failure to provide certain documents, deletion of documents such as emails,

and provision of documents that had been altered or redacted.  *Id.* at 6–8.  CBP then

---

[8] CBP subsequently released a public version of the Verification Report.  *See* On-Site
Verification Report (Feb. 25, 2019) ("Public Verification Report"), PRR 61.
[9] Section 165.23 addresses the submission of factual information.

attempted to verify the Philippine Shipper's overall production capacity using the payroll records associated with the seven Royal Brush invoices.  *Id.* at 9.  CBP found that the Philippine Shipper's volume of exports to the United States exceeded its production capacity as calculated by CBP's verification team.  *Id.* at 8–9.  Lastly, "[e]vidence obtained during the verification" indicated that the Philippine Shipper's previously-submitted payroll documents "were unsupported," *id.* at 9, such that CBP was "unable to verify that the stated employees were, in fact, paid and/or that there was production during those time periods," *id.* at 10.

On May 6, 2019, Customs issued an affirmative evasion determination.  Notice of Final Determination as to Evasion, EAPA Case No. 7238 (May 6, 2019) ("May 6 Determination"), CR 131, PR 57.  Pursuant to section 1517(c), Customs' determination as to whether covered merchandise entered the United States through evasion must be "based on substantial evidence."  19 U.S.C. § 1517(c)(1)(A).  However, when the person alleged to have engaged in evasion, or the person that is the foreign producer or exporter of the covered merchandise, "fail[s] to cooperate by not acting to the best of the party or person's ability to comply with a request for information," Customs may "use an inference that is adverse to the interests of" that person when "selecting from among the facts otherwise available."  *Id.* § 1517(c)(3)(A).  Consistent with these authorities, CBP concluded "that substantial evidence, in conjunction with an assumption of adverse inferences related to information requested but not provided, indicates [that] Royal Brush's imports were merchandise entered through evasion."  May 6 Determination at 5; *see also id.* at 8 (finding substantial evidence to support a finding of evasion based

on the available evidence "and the absence of information due to [the] Philippine[ ] Shipper's failure to cooperate and comply to the best of its ability").

Royal Brush requested an administrative review of Customs' May 6 Determination pursuant to 19 U.S.C. § 1517(f).  *See Royal Brush I*, 483 F. Supp. 3d at 1301.  On September 24, 2019, CBP completed its *de novo* Administrative Review. *See* Decision on Request for Admin. Review, EAPA Case No. 7238 (Sept. 24, 2019) ("Admin. Review"), PR 64.  In its review, CBP found that there was substantial evidence to support a finding that the pencils imported by Royal Brush during the period of investigation were manufactured in China—not the Philippines.  *Id.* at 11–19.  CBP explained that, in response to its requests for information, Royal Brush had provided quality compliance certifications that listed China as the country of origin for the tested pencils.  *Id.* at 12.  CBP also summarized the Attaché's findings indicating the absence of production activity by the Philippine Shipper and the repackaging of pencils made in China into boxes labeled "Made in Philippines" for export to the United States.  *Id.* at 13; *see also id.* at 14 (discussing the Attaché Report).

According to CBP, "[t]he question for further development thus became the capacity of the Philippine [Shipper] to manufacture at the level described, given the lack of resources observed during the first on-site visit."  *Id.* at 13.  CBP explained that verification was conducted in order "to determine whether the Philippine [Shipper] could show that it was capable of producing the amount of pencils allegedly manufactured for Royal Brush, as well as to clarify the country of origin for pencils imported by Royal Brush."  *Id.* at 14.  CBP noted the Verification Report's summary of the association

between the Philippine Shipper and "certain trading companies in China," including that certain officers held positions with both the Philippine Shipper and the Chinese trading companies. *Id.* at 15. CBP also pointed to the inability of the Philippine Shipper to satisfactorily account for the production of the pencils associated with the seven Royal Brush invoices and the verification team's findings regarding overall production capacity. *Id.* at 15, 17. CBP concluded that "[t]he production in the Philippines for Royal Brush's imports remains unsubstantiated, as amply demonstrated in the verification report by trained CBP auditors." *Id.* at 16.

CBP additionally found that "adverse inferences were warranted, inasmuch as the importer, as well as the alleged foreign producer and exporter, *failed* to provide sufficient evidence to demonstrate that the pencils imported by Royal Brush were manufactured in the Philippines." *Id.* at 18. CBP thus "reasonably filled those evidentiary gaps with some adverse inferences." *Id.*

CBP's finding of evasion in the Administrative Review precipitated this appeal. *See* Summons, ECF No. 1; Compl., ECF No. 2; *see also* 19 U.S.C. § 1517(g) (providing for judicial review following CBP's completion of an administrative review pursuant to subsection (f)).

In due course, Royal Brush moved for judgment on the agency record pursuant to U.S. Court of International Trade ("USCIT" or "CIT") Rule 56.2. Confidential Pl. [Royal Brush's] Mot. for J. on the Agency R., ECF No. 33. Royal Brush raised four challenges to Customs' evasion determination, arguing that Customs: (1) improperly rejected Royal Brush's filing seeking to rebut purportedly new factual information

contained in Customs' verification report; (2) deprived Royal Brush of due process and redacted or withheld material evidence in an arbitrary and capricious manner; (3) improperly applied adverse inferences; and (4) drew irrational conclusions from the evidence concerning production capacity.  Confidential Pl. [Royal Brush's] Mem. in Supp. of its Mot. for J. on the Agency R. ("Pl.'s 56.2 Mem.") at 9–26, ECF No. 33-1; *see also* Confidential Reply Br. of Pl. [Royal Brush] ("Pl.'s 56.2 Reply"), ECF No. 43.  The court held a closed hearing on Royal Brush's Rule 56.2 motion on October 6, 2020. *See* Confidential Oral Arg. (Oct. 6, 2020) ("56.2 Hr'g") (on file with the court); Docket Entry, ECF No. 49.

In *Royal Brush I*, the court remanded CBP's determination with respect to issues (1) and (2) and deferred addressing issues (3) and (4) pending CBP's Remand Results. 483 F. Supp. 3d at 1297.  The court held that CBP failed to provide a reasoned explanation for its rejection of Royal Brush's rebuttal information because CBP had not identified "the standard CBP used to define 'new factual information'" or explained how it applied any such standard to the Verification Report.  *Id.* at 1303.  The court further held that a remand was required for CBP to comply with its regulation requiring public summaries of confidential filings.  *Id.* at 1305; *see also* 19 C.F.R. § 165.4(a)(2), (e).[10]

---

[10] CBP's regulation permits interested parties to request confidential treatment for information that "consists of trade secrets and commercial or financial information obtained from any person, which is privileged or confidential in accordance with 5 U.S.C. [§] 552(b)(4)."  19 C.F.R. § 165.4(a).  A party seeking confidential treatment "must also file a public version of the submission" that "contain[s] a summary of the bracketed information in sufficient detail to permit a reasonable understanding of the substance of the information."  *Id.* § 165.4(a)(2); *see also id.* § 165.4(e) (extending the public summary requirement to confidential information placed on the record by CBP).

The court explained that although "EAPA does not require or establish a procedure for the issuance of an administrative protective order ('APO') akin to the procedure used in antidumping and countervailing duty proceedings or otherwise address Customs' management of confidential information," *Royal Brush I*, 483 F. Supp. 3d at 1306, CBP must comply with the requirements in the regulation and CBP's failure to do so deprived Royal Brush the process to which it was entitled, *id.* at 1306–07.  The court clarified, however, that it did "not hold that Royal Brush is entitled to receive business confidential information," noting that "Congress has not mandated that Royal Brush be afforded such access and Royal Brush has not shown that due process requires it." *Id.* 1308.

As discussed in more detail below, CBP has now issued its remand results in which it documents the addition of revised public summaries to the administrative record and explains its continued rejection of Royal Brush's rebuttal submission based on the absence of new factual information in the verification report. *See generally* Remand Results.

Oral argument on Royal Brush's opposition to the Remand Results took place on October 6, 2021.  *See* Confidential Oral Arg. (Oct. 6, 2021) ("Remand Hr'g") (on file with the court); Docket Entry, ECF No. 71.

JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 517(g) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1517(g) (2018), and 28 U.S.C. § 1581(c) (2018).

EAPA directs the court to determine whether a determination issued pursuant to 19 U.S.C. § 1517(c) or an administrative review issued pursuant to 19 U.S.C. § 1517(f)

was "conducted in accordance with those subsections."   19 U.S.C. § 1517(g)(1).  In so

doing, the court "shall examine . . . whether [CBP] fully complied with all procedures

under subsections (c) and (f)" and "whether any determination, finding, or conclusion is

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

*Id.* § 1517(g)(2).

DISCUSSION

The court first addresses the issues discussed on remand before turning to the

issues the court deferred in *Royal Brush I*.

**I.     Public Summaries**

On remand, CBP required the submission of public summaries to accompany

confidential documents when necessary for compliance with 19 C.F.R. § 165.4(a)(2)

and (e).  Remand Results at 15–16.  Royal Brush, Dixon, the Philippine Shipper and

CBP all placed revised public summaries on the record.  *Id.* at 16–17, 20–22.  CBP

allowed parties to the investigation "to submit rebuttal information pertinent to the

revised public versions of the administrative record documents."  *Id.* at 17.  CBP also

allowed the submission of written arguments responsive to the public summaries.  *Id.* at

19.  Royal Brush submitted such arguments; Dixon did not.  *Id.*

In its written comments, Royal Brush presented several arguments concerning

the adequacy of the public summaries accompanying the Attaché Report and

Verification Report, including the summaries of the photographs attached to the reports.

*Id.* at 22–26.  CBP responded that it was precluded from revealing the contested

information because it was confidential or, in the case of the photographs, would reveal

confidential information.  *Id.* at 22–26, 30–33.  CBP further noted that it did not rely on the Attaché Report for its final evasion determination.  *Id.* at 24.  CBP also rejected Royal Brush's challenges to the adequacy of the public summaries of the Allegation and its exhibits.  *Id.* at 27, 33–34.

Before the court, Royal Brush contends that the revised public summaries "continue to deprive Royal Brush of due process."  Pl.'s Opp'n Cmts. at 4.  Royal Brush argues that due process requires that it "be apprised of all the evidence against it and have a meaningful opportunity to respond to that evidence."  *Id.* at 8.  According to Royal Brush, CBP's revised public summaries—which contain descriptors such as "country name(s)," "date," and "number" in lieu of precise data—fail to convey the substance of the information as required by the regulation and deny Royal Brush due process.  *Id.* at 9; *see also id.* at 5 n.6.  Royal Brush's arguments are unpersuasive.

The court previously recognized that "an importer participating in an administrative proceeding has a procedural due process right to 'notice and a meaningful opportunity to be heard.'"  *Royal Brush I*, 483 F. Supp. 3d at 1305 (quoting *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761–62 (Fed. Cir. 2012)).  "Such opportunity must occur 'at a meaningful time and in a meaningful manner.'"  *Id.* at 1306 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).  What that means as a practical matter depends on the circumstances of each case: "[D]ue process is flexible and calls for such procedural protections as the particular situation demands."  *Mathews*, 424 U.S. at 334 (citation omitted) (alteration in original).  In order to determine "whether the administrative procedures provided [in a given case] are constitutionally

sufficient," the court typically undertakes a fact-based inquiry focused on the following

three factors:

> First, the private interest that will be affected by the official action; second, the
> risk of an erroneous deprivation of such interest through the procedures used,
> and the probable value, if any, of additional or substitute procedural safeguards;
> and finally, the Government's interest, including the function involved and the
> fiscal and administrative burdens that the additional or substitute procedural
> requirement would entail.

*Id.* at 335; *see also Engdahl v. Dep't of Navy*, 900 F.2d 1572, 1575–77 (Fed. Cir. 1990)

(applying the *Mathews* balancing test to determine whether the process afforded the

appellant before he was suspended without pay complied with due process).

Royal Brush does not frame its argument in terms of the *Mathews* balancing test

and makes no argument as to the first and third factors.  Instead, Royal Brush raises

arguments only on the second factor, asserting that CBP violated its due process rights

by relying on "secret" information to reach its decision.  Pl.'s Opp'n Cmts. at 4 (citing

*Greene v. McElroy*, 360 U.S. 474, 492–97 (1959), *Robbins v. U.S. R.R. Retirement Bd.*,

594 F.2d 448 (5th Cir. 1979), and *American-Arab Anti-Discrimination Committee v.*

*Reno*, 70 F.3d 1045, 1069 (9th Cir. 1995) ("*AAADC*")).  However, none of the cited

cases compel the conclusion that CBP was required to grant Royal Brush access to

confidential information during the EAPA investigation.

In *Greene v. McElroy*, 360 U.S. 474 (1959), the petitioner asserted a due process

violation when the U.S. Department of Defense ("DOD") revoked his security clearance

based on statements made by confidential informants to investigators.   360 U.S. at 492,

475–90.  In relevant part, the Court held that without "explicit authorization from either

the President or Congress the respondents were not empowered to deprive [the] petitioner of his job in a proceeding in which he was not afforded the safeguards of confrontation and cross-examination." *Id.* at 508.  While the Court remanded the case for further consideration without deciding whether the procedures afforded complied with the Fifth Amendment, the Court acknowledged that the right that was ultimately at stake, "the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference[,] comes within the 'liberty' and 'property' concepts of the Fifth Amendment." *Id.* at 492.  *Greene* is inapposite for at least two reasons.  First, as noted above, Royal Brush failed to make any argument as to the nature of the private right that it seeks to protect and, in particular, has not established that it seeks the confidential information in order to protect a right comparable to the liberty and property interests at stake in *Greene*.  *See Royal Brush I*, 483 F. Supp. 3d at 1305 (noting that Royal Brush lacks a fundamental right to engage in foreign commerce); *Mathews*, 424 U.S. at 334 (explaining that the requirements of due process are situation-specific).  Second, CBP's authority to provide public summaries of business proprietary information, rather than the information itself, is more established than was the DOD's authority to rely on confidential information to revoke petitioner's security clearance in *Greene*, and Royal Brush has not shown that greater access to confidential information is otherwise constitutionally required.

Royal Brush fares no better with its reliance on *Robbins v. U.S. R.R. Retirement Bd.*, 594 F.2d 448 (5th Cir. 1979).  There, the U.S. Railroad Retirement Board ("the Board") denied a claim for unemployment benefits; however, the U.S. Court of Appeals

for the Fifth Circuit held that the Board's consideration of evidence withheld from the claimant failed to meet the statutory requirements for a "fair hearing" embodied in the relevant statute.  *Id.* at 450.  As this court did in *Royal Brush I*, 483 F. Supp. 3d at 1306–07, the appellate court considered whether the plaintiff received the process he was due pursuant to the statute, *id.* at 451–52.  Unlike the plaintiff in *Robbins*, Royal Brush has now received public summaries of the information collected by CBP and has had an opportunity to respond to that information before the agency.  Remand Results at 15.  *Robbins* does not suggest that more is required.  *See* 594 F.2d at 451–53.

In *American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d 1045 (9th Cir. 1995), the court held that the Immigration and Naturalization Service ("INS") violated due process when it relied on undisclosed classified information in legalization proceedings.  70 F.3d at 1052, 1068–70.  However, like *Robbins*, *AAADC* is distinguishable from this case because the information relied on by INS was withheld *in toto* from the petitioners.  *See id.* at 1070.

Here, CBP has shared information with Royal Brush consistent with its regulation and in a manner that balances the need to disclose evidence against an importer with the need to protect certain information from unauthorized disclosure.  Royal Brush does not argue that CBP's regulation, on its face, unreasonably limits Royal Brush's ability to defend itself.  Indeed, CBP's regulation, which requires "a summary of the bracketed information in sufficient detail to permit a reasonable understanding of the substance of the information," 19 C.F.R. § 165.4(a)(2), provides importers such as Royal Brush an

"adequate opportunity . . . to respond to the evidence used against them," *Royal Brush I*, 483 F. Supp. 3d at 1306.[11]

Royal Brush does, however, contest the adequacy of the public summaries with respect to discrete categories of information in this case. Pl.'s Opp'n Cmts. at 5–9. It contends that CBP's refusal "to disclose the numerical data it used to calculate the Philippine [Shipper's] overall production capacity or the results of its calculation" rendered Royal Brush unable to respond to this "critical quantitative evidence." *Id.* at 5.[12] Upon examination of the confidential record made available on judicial review, Royal Brush argues that "CBP relied on an unrepresentative sample of data to construct the equation it used to calculate overall production capacity," and CBP's public summaries did not permit Royal Brush the opportunity to present this argument. *Id.* at

---

[11] Royal Brush appears to suggest that the court should impose an extra-statutory requirement akin to the APO procedure used in Commerce proceedings. Pl.'s Opp'n Cmts. at 8 (citing *Huzhou Muyun Wood Co. v. United States*, 41 CIT __, __, 279 F. Supp. 3d 1215, 1224–25 (2017), and *Al Haramain Islamic Foundation, Inc. v. U.S. Dept. of Treasury*, 686 F.3d 965, 982-84 (9th Cir. 2012)). Those cases were decided based on their respective facts and do not compel a particular outcome here. *See Huzhou Muyun*, 279 F. Supp. 3d at 1224–25 (holding that Commerce's placement of information on the administrative record shortly before the record closed and corresponding inability to permit an extension of time to respond to the new information was unreasonable); *Al Haramain*, 686 F.3d at 979–84, 988–90 (finding that government office erred in withholding classified information as part of its determination to classify the plaintiff as a terrorist organization when the office could have mitigated the use of classified information by providing an unclassified summary of the evidence, but that such error was harmless in that case).
[12] CBP summarized the values as "number" or "no." Public Verification Report at 9–10.

5–6.  Royal Brush thus suggests that this is a due process violation because it impacted Royal Brush's response to the evidence against it.  *Id.*[13]

Royal Brush does not contest the confidential nature of the information, which CBP is precluded from disclosing by statute and regulation.  *See* 19 C.F.R. § 165.4(a); Remand Results at 25 & n.113 (citing 18 U.S.C. § 1905).[14]  Thus, conveying the "substance of the information" in public summaries within the meaning of CBP's regulation must be understood as nevertheless allowing for the protection of the confidential information.  Royal Brush fails to identify how CBP could convey the substance (but not the specifics) of the information other than describing it as "number" or "no."[15]  Instead, Royal Brush simply complains that it needed the actual figures. However, as previously noted, Royal Brush has not demonstrated that due process requires such access.  It requires notice and a meaningful opportunity to be heard,

---

[13] Royal Brush appears to base this argument on evidence demonstrating that CBP calculated the Philippine Shipper's overall production capacity to be less than its total U.S. shipments in 2018, yet in excess of Royal Brush's orders in that same year.  Pl.'s Opp'n Cmts. at 5 & nn.9–10 (citing Verification Report at 9).  Royal Brush cross-references its argument that CBP's determination on remand was arbitrary and capricious.  *Id.* at 6 & n.11 (citation omitted).  Royal Brush asserts that CBP used information specific to Royal Brush's orders to "extrapolate the Philippine [Shipper's] overall production capacity."  *Id.* at 13.

[14] Pursuant to 18 U.S.C. § 1905, a CBP official's disclosure of certain business confidential information could expose that official to a fine or imprisonment of not more than one year.

[15] CBP rejected Royal Brush's contention that CBP should have provided a numerical range of the data used to calculate the Philippine Shipper's overall production capacity. Remand Results at 32–33.  Royal Brush does not contest that determination specifically but objects generally that designations such as "number" do not comport with the regulatory requirement.  Pl.'s Opp'n Cmts. at 5 n.6

*Royal Brush I*, 483 F. Supp. 3d at 1305 (citing *Avisma*, 688 F.3d at 761–62), which were provided here in the form of public summaries and comment procedures.

Further, the Public Verification Report disclosed that CBP relied on invoices specific to Royal Brush to calculate the Philippine Shipper's overall production capacity; the source of CBP's information was not redacted. *See* Public Verification Report at 8–9. Thus, Royal Brush was not precluded from making an argument regarding the unrepresentativeness of its purchases from the Philippine Shipper in its written submission. Accordingly, Royal Brush has not shown that it was prejudiced by CBP's preparation of the public version of the Verification Report. *Cf., e.g.*, *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").

Royal Brush also contends that CBP failed "to disclose certain *non*-confidential information it relied on to conclude that the Philippine [Shipper] was 'unequivocally' re-packaging Chinese-origin pencil products" for export to the United States. Pl.'s Opp'n Cmts. at 6 (citing Admin. Review at 13–14). Such allegedly non-confidential information from photographs taken during the Attaché's site visit included (1) the destination country "for boxes containing the 'Made in China' pencils;" (2) "the type of 'completed pencil product' contained in the boxes;" and (3) the condition of those boxes. *Id.* (citing Remand Results at 23–24, 30–31, 35–36). In response, CBP explained that providing the photographs would reveal the Philippine Shipper's customers, which "information is generally considered as confidential." Remand Results at 31. CBP also explained that

the Philippine Shipper had not given "any indication . . . that [such information] is not [confidential]."  *Id.*

While Royal Brush argues that this information is "crucial" in order to know whether (1) "the repackaged pencils were of the same type as exported to Royal Brush;" (2) the Chinese characters on the boxes "identify a company name, a type of raw material used in pencil-production, or a color;" (3) "the contents of a given box match the label affixed thereto;" and (4) the destination for the boxes, Royal Brush does not explain why that information is crucial to undermining CBP's final determination. Pl.'s Opp'n Cmts. at 7–8.  Instead, Royal Brush speaks only in generalities about its desire to have access to this information.  *See id.*

As CBP explained, "the type of pencils the CBP Attaché witnessed being re-packaged at the Philippine[] Shipper's facility was not relevant to the CBP determination of evasion and CBP has never stated that they were the same type of pencil exported to Royal Brush."  Remand Results at 38.  Rather, the Attaché's observations were "consistent with the Philippine[] Shipper engaging in a scheme to transship Chinese-origin pencils to the United States" and "[e]vidence that the Philippine[] Shipper was engaging in an overall transshipment scheme was plainly relevant to whether the Philippine[] Shipper transshipped the specific pencils exported to Royal Brush."  *Id.* Thus, Royal Brush has not shown that due process required CBP to disclose the requested information in order to rebut the allegation of evasion that is specific to Royal Brush.

Court No. 19-00198                                                                    Page 20

Accordingly, the court finds that CBP has complied with 19 C.F.R. § 165.4 by providing necessary public summaries of the confidential information and that Royal Brush has not established that CBP has failed to provide Royal Brush the process that it is due.

II.    **Verification Report**

In the Remand Results, CBP described the scope and purpose of the verification process, explaining that "[a] verification report documents the verification process and therefore is not itself 'new factual information' and as a matter of CBP practice should not contain 'new factual information.'"  Remand Results at 6.  CBP further explained that if "information outside the scope of the verification and unrelated to the verification of information on the record [is] discovered during a verification . . . , such information could be 'new factual information'" and, under that scenario, "CBP would not discuss the information in the verification report but instead would place it on the record pursuant to 19 C.F.R. 165.25(b)" and would permit rebuttal information.  *Id.*; *see also id.* at 11.

CBP re-examined the verification report at issue here and again concluded that it did not contain new factual information.  *Id.* at 7.  CBP therefore concluded that it had properly rejected Royal Brush's rebuttal submission.  *Id.*  CBP explained that the findings in the report did not constitute new factual information but instead identified "discrepancies in the information that was placed on the record," or, in other words, represented "[t]he results of the verification of that information."  *Id.* at 8. Similarly, CBP explained that "calculations based on the data submitted in response to [requests for information ("RFIs")]" were not new factual information but instead represented "CBP

using and verifying the factual data on the record." *Id.* at 9.  Further, with respect to the

Philippine Shipper's overall production capacity, CBP noted that "all entries from the

Philippine Shipper, from [fiscal year ("FY")]2014 to FY2018, were placed on the record

and therefore [were] within the scope of verification." *Id.* at 13.  CBP also rejected the

argument that interviews with the Philippine Shipper's employees constituted new

factual information, explaining that those interviews were necessary to verify the

Philippine Shipper's responses regarding operations and recordkeeping.  *Id.* at 9–10.

Royal Brush contends that CBP's consideration of the Philippine Shipper's

overall production capacity constituted a new issue; Royal Brush lacked sufficient notice

of the issue; and Royal Brush did not have an adequate opportunity to respond to this

information.  Pl.'s Opp'n Cmts. at 9–11, 14.

In general, "notice [must be] reasonably calculated, under all the circumstances,

to apprise interested parties of the pendency of the action and afford them an

opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339

U.S. 306, 314 (1950).  Royal Brush does not provide authority for the proposition that

adequate notice of the evasion investigation required CBP to provide advance notice

regarding each aspect of the inquiry that CBP might find relevant to its investigation and

determination.  In particular, with respect to the Philippine Shipper's overall production

capacity, CBP noted that all of the Philippine Shipper's entries for the period of

investigation were on the record, not just Royal Brush's entries.  Remand Results at 9

n.35 (citing CBP NTAG Data, CR 7).[16]  Thus, Royal Brush should not be surprised that CBP's "investigation could potentially consider the Philippine[] Shipper's overall production capacity" given the relevance of a manufacturer's production capacity to a transshipment investigation.  *Id.* at 14.

In support of its argument that CBP was required to give advance notice of the relevance of overall production, Royal Brush relies on *Huzhou Muyun*, 41 CIT __, __, 279 F. Supp. 3d 1215, 1224–25 (2017).  *See* Pl.'s Opp'n Cmts. at 10.  In *Huzhou Muyun*, Commerce placed detailed information on the record close to the deadline for submission of factual information, with only a brief description of the nature of the information, leaving the plaintiff "not clearly apprised of what, specifically, it was meant to rebut."  279 F. Supp. 3d at 1224–25.  Here, by contrast, Royal Brush was provided an opportunity to respond to CBP's Verification Report.  *See* Remand Results at 14–18.  Furthermore, the Verification Agenda apprised the Philippine Shipper, in advance, that the verification could cover any information provided in its responses to CBP's requests for information.  *See* Verification Agenda at 1 (citing 19 C.F.R. § 165.23).  While CBP emphasized the verification of information associated with five Royal Brush invoices, *id.* at 2, CBP's verification was not limited thereto.  *See id.* at 1–3.  Royal Brush's assertion that overall production capacity constituted a new issue requiring some additional form of notice is, thus, unpersuasive.

---

[16] CBP incorrectly cites this as CR 6.  *See* Remand Results at 9 n.35.

Royal Brush also contends that CBP's assertion that only information beyond the scope of verification may constitute new factual information merely "reprises the discredited argument that information within the scope of the verification cannot be 'new.'" Pl.'s Opp'n Cmts. at 11.  Royal Brush further asserts that information in the Verification Report regarding overall production capacity constitutes new factual information because, before verification, "CBP had not sought, nor had the Philippine [Shipper] provided, data about its overall production capacity." Id.; see also id. at 11–12 (stating that CBP "generate[d] such data—for the first time—by extrapolating from the information produced about Royal Brush's seven orders").  CBP explained that the calculations it used were not "new factual information" because they were "simply CBP using and verifying the factual data on the record" and were "a natural part of CBP's investigation as to whether evasion occurred."[17]  Remand Results at 8.

As CBP explained, "[v]erification is the process by which CBP checks, reviews, and corroborates factual information" previously placed on the record. Id. at 5.  The

_____

[17] During Oral Argument, counsel for Royal Brush suggested that using the data in this way constituted "expert analysis," and, thus, new factual information.  Remand Hr'g, 0:41:52–0:42:30 (time stamp from the closed hearing).  In that vein, in Apex Frozen Foods Private Ltd. v. United States, 40 CIT __, 144 F. Supp. 3d 1308 (2016), aff'd, 862 F.3d 1337 (Fed. Cir. 2017), the court recognized that certain expert analysis may assume the weight of evidence and, thereby, amount to "[d]ata or statements of fact in support of allegations, i.e., factual information." Id. (citing PSC VSMPO–Avisma Corp., 688 F.3d at 760–61).  Here, however, CBP used the data to identify discrepancies and perform basic calculations for the purposes of verification—not expert analysis that "assumes the weight of evidence" by making determinations about the reliability or importance of the data.  Cf. Coal. for Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States, 23 CIT 88, 9944 F. Supp. 2d 229, 241 (1999) (finding that calculations and analysis gleaned from the record are not new factual information).

Verification Report documents CBP's inability to verify that the pencils exported to Royal Brush in the United States were manufactured by the Philippine Shipper, *see* Verification Report at 5–8 (describing various issues with the documents provided), which led CBP reasonably to attempt to verify information provided by the Philippine Shipper regarding its overall production capacity, *see id.* at 9 (citing Resp. to CBP Importer Request for Information (Oct. 3, 2018), Ex. 31, CR 14,).  To that end, CBP attempted to use the available payroll records to assess whether sufficient personnel worked the number of shifts required to meet the purported production capacity.  *See id.* at 10.  CBP explained that it found "discrepancies" in the record and documented those discrepancies in its report.  Remand Results at 8.  According to CBP, the calculations in the Verification Report represented "CBP using and verifying the factual data on the record and therefore are a natural part of CBP's investigation."  *Id.* at 9.

CBP also noted that allowing post-verification submissions to address discrepancies identified at verification, as Royal Brush calls for, would result in "an endless cycle of attempts to verify those post-verification submissions."  *Id.* at 5.  The court finds that CBP's interpretation of its regulations with regard to "new factual information," in a manner consistent with completing its investigation and meeting its statutory deadlines, is reasonable.   In view of the foregoing, the court finds that CBP has provided "a reasoned analysis [and] explanation" for its decision to reject Royal Brush's rebuttal submission.  *See Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998).

Royal Brush also contends that CBP's evasion determination was arbitrary and capricious because the record fully demonstrates that the Philippine Shipper had the capacity to fulfill Royal Brush's orders.  Pl.'s Opp'n Cmts. at 12–13.  Royal Brush further argues that "it is impossible for a reasonable mind to conclude that the agency chose the best available information and that its conclusion about the overall production capacity is supported by substantial evidence" when CBP relied on extrapolations drawn from information about Royal Brush's orders and failed to request evidence about overall production capacity from the Philippine Shipper.  *Id.* at 14.

CBP did not base its finding of evasion solely on its conclusion that the Philippine Shipper lacked the capacity to produce all the pencils it shipped to the United States.  In fact, as CBP's Remand Results make clear, CBP only turned to the Philippine Shipper's overall capacity after the agency was unable to verify the Royal Brush-specific production information that the Philippine Shipper submitted to CBP.  Remand Results at 8–9.  Thus, CBP made two independent but mutually supportive verification findings, both of which supported its evasion determination.  Additionally, Royal Brush's assertion to the court that the Philippine Shipper can "increase or decrease production on demand" such that CBP unreasonably extrapolated from Royal Brush-specific data lacks citation to any record evidence.  Pl.'s Opp'n Cmts. at 14.  Thus, the court finds that this argument lacks merit.

For these reasons, the court sustains CBP's decision to reject Royal Brush's rebuttal submission.

### III.   Deferred Issues

Royal Brush's remaining challenges relate to CBP's use of adverse inferences and its conclusions with respect to the Philippine Shipper's overall production capacity. The court addresses the issue of production capacity first because CBP claimed that finding was based on substantial evidence and any adverse inferences were only made in the alternative.   Royal Brush acknowledges that if the court affirms CBP's findings with respect to production capacity, the court need not reach the question of adverse inferences.

Royal Brush contends that CBP's affirmative finding of evasion based on the Philippine Shippers' purported insufficient production capacity is irrational.   Pl.'s 56.2 Mem. at 24–25; Pl.'s 56.2 Reply at 11–13.[18]   Royal Brush argues that record evidence demonstrates that the Philippine Shipper's production capacity—as quantified by CBP's verification team—exceeded Royal Brush's orders, Pl.'s 56.2 Mem. at 25; Pl.'s 56.2 Reply at 12.[19]   According to Royal Brush, CBP's calculations regarding overall production capacity create only the "mere possibility" that Royal Brush's pencils "were

---

[18] Royal Brush also asserts that "CBP's conclusion that the Philippine [Shipper] did not have the capacity to produce enough pencils to fulfill Royal Brush's orders . . . is irrational."   Pl.'s 56.2 Mem. at 26.   Royal Brush mischaracterizes CBP's determination, which found a lack of capacity to produce all the Philippine Shipper's orders for 2018. *See* Admin. Review at 15–17.

[19] Royal Brush alludes to other CBP conclusions that it contends are also arbitrary and capricious.   Pl.'s 56.2 Mem. at 26.   Royal Brush does not, however, develop those arguments and, thus, has waived the opportunity to do so.   *See, e.g.*, *United States v. Great Am. Ins. Co. of NY*, 738 F.3d 1320 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived.").

not manufactured in the Philippines," which Royal brush claims falls short of the

substantial evidence required for CBP's determination pursuant to 19 U.S.C.

§ 1517(c)(1)(A). Pl.'s 56.2 Reply at 12.[20]

　　　With respect to the court's standard of review, "[a]n abuse of discretion occurs

whe[n] the decision is based on . . . factual findings that are not supported by

substantial evidence . . . ." *Consol. Bearings Co. v. United States*, 412 F.3d 1266, 1269

(Fed. Cir. 2005) (citation omitted); *see also* 19 U.S.C. § 1517(g)(2). Royal Brush does

not, however, specifically contest CBP's factual findings; rather, Royal Brush challenges

the legal conclusion that CBP reached on the basis of those findings. "The scope of

review under the "arbitrary and capricious" standard is narrow," however, "and a court is

not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S.,*

*Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). To survive judicial

review, Customs "must examine the relevant data and articulate a satisfactory

explanation for its action[,] including a 'rational connection between the facts found and

the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156,

168 (1962)). Customs has done so here.

　　　As discussed above, CBP was unable to verify the Philippine Shipper's

production of pencils tied to the seven Royal Brush invoices reviewed at verification.

---

[20] Royal Brush claims that a "probability" of evasion is required. *See* Pl.'s 56.2 Reply at
12. While substantial evidence "requires more than a mere scintilla" of evidence, it may
represent "less than the weight of the evidence." *Nucor Corp. v. United States*, 34 CIT
70, 72, 675 F. Supp. 2d 1340, 1345 (2010) (quoting *Altx, Inc. v. United States*, 370 F.3d
1108,1116 (Fed. Cir. 2004)).

Admin. Review at 15.  CBP then looked to confirm whether the Philippine Shipper's overall production capacity was adequate to meet the company's total volume of exports to the United States.  *See id.* at 17.  The Philippine Shipper effectively failed verification on that issue as well, because although the company "did appear to have the capacity to produce pencils, it did not appear to be able to produce pencils in the quantities alleged for the company's 2018 operations."  *Id.* at 15.

Royal Brush suggests, in effect, that CBP was required to assume that its pencils were among the orders that the Philippine Shipper had the capacity to produce.  Pl.'s Opp'n Cmts. at 13–14.  Royal Brush offers no support for requiring such an assumption. While Customs must carry its burden of issuing a determination that is supported by substantial evidence, 19 U.S.C. § 1517(c)(1)(A), interested parties bear the burden of supplying Customs with accurate information that withstands verification, *id.* § 1517(c)(2).  That did not happen here.  CBP's finding of evasion, based on its examination of the evidence gathered during the investigation and the well-documented failures at verification, including the Philippine Shipper's failure to verify the production of the pencils shipped to Royal Brush, *see* Admin. Review at 12–17, is supported by a reasoned explanation that contains "a 'rational connection between the facts found and the choice made,'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  Thus, the court finds no reason to disturb it.

With respect to adverse inferences, while Customs must generally base its evasion determination on substantial evidence pursuant to 19 U.S.C. § 1517(c)(1)(A), Customs may "use an inference that is adverse to the interests of" the person alleged to

have engaged in evasion or "a person that is a foreign producer or exporter" of the covered merchandise when "selecting from among the facts otherwise available" if that person "failed to cooperate by not acting to the best of the party or person's ability to comply with a request for information." 19 U.S.C. § 1517(c)(3)(A). An adverse inference "may include reliance on information derived from . . . (i) the allegation of evasion . . .; (ii) a determination by [CBP] in another investigation, proceeding, or other action regarding evasion of the unfair trade laws; or (iii) any other available information." *Id.* § 1517(c)(3)(C).

Royal Brush directs its challenges to Customs' use of adverse inferences in the Administrative Review of Custom's Final Determination. Pl.'s 56.2 Mem. at 21–23; Pl.'s 56.2 Reply at 10–11. Therein, CBP found that substantial evidence supported the conclusion that Royal Brush imported pencils that were not made in the Philippines but were instead made in China. Admin. Review at 11–17. CBP also determined that "adverse inferences were warranted, inasmuch as the importer, as well as the alleged foreign producer and exporter, *failed* to provide sufficient evidence to demonstrate that the pencils imported by Royal Brush were manufactured in the Philippines." *Id.* at 18. While CBP purported to "fill[] those evidentiary gaps with some adverse inferences," CBP also stated that, "even without adverse inferences, the record as a whole adequately and reasonably supports a [finding of evasion]." *Id.* Thus, CBP relied on adverse inferences as an alternative basis for finding evasion that was otherwise based on substantial evidence. For this reason, at oral argument on Royal Brush's Rule 56.2 motion, the court asked the Parties whether it needed to reach the challenge to CBP's

Court No. 19-00198                                                                      Page 30

use of adverse inferences "if the court resolves Plaintiff's challenges to the substantiality of the evidence regarding production capacity against Plaintiff." Letter Order (Sept. 30, 2020) at 4, ECF No. 47. The Parties agreed that the court would not need to reach this issue. 56.2 Hr'g, 2:38:25–2:40:05, 2:50:10–2:51:30, 2:51:35–2:52:25 (time stamp from the closed hearing) (on file with the court); *see also* Remand Hr'g, 0:27:20–0:28:00 (confirming same).

Accordingly, because the court finds that Plaintiff's challenges to CBP's findings regarding overall production capacity lack merit, the court finds that Plaintiff's challenge to CBP's alternative reliance on adverse inferences is moot.

CONCLUSION

Based on the foregoing, the court sustains CBP's final determination of evasion as amended by the Remand Results. Judgment will enter accordingly.


/s/      Mark A. Barnett
Mark A. Barnett, Chief Judge


Dated: October 29, 2021
        New York, New York